[Cite as *State v. Prichard*, 2026-Ohio-56.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                    Court of Appeals No. {87}WD-25-028

    Appellee                              Trial Court No.  2024 CR 0431

v.

Robert M. Prichard                         **DECISION AND JUDGMENT**

    Appellant                            Decided: January 9, 2026

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, and
Kristofer A. Kristofferson, Assistant Prosecuting Attorney, for appellee.

Michael H. Stahl, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Robert Prichard, appeals the

April 21, 2025 judgment of the Wood County Court of Common Pleas, convicting him of

receiving stolen property.  For the following reasons, we affirm the trial court judgment.

**I.  Background**

{¶ 2} Robert Prichard was charged with one count of receiving stolen property, a

violation of R.C. 2913.51(A) and (C), a fourth-degree felony.  The property at issue was a

travel trailer belonging to J.L.  The case was tried to a jury beginning April 16, 2025. The following evidence was presented at trial.

{¶ 3} On October 21, 2024, at approximately 8:00 a.m., F.T. and his wife discovered that a travel trailer (also referred to as a camper) had been left on their property on Railroad Avenue in Bradner, Ohio.  F.T.'s wife called the sheriff's department to report it, then she left for work.  Before leaving, she found a note on the windshield wiper of her vehicle that said, "Hillbilly Bob is the man who parked the camper.  Give me a call if you got any questions or anything[.]  [M]y number is 419-[redacted].  Thx."

{¶ 4} F.T. examined the outside of the camper and observed that the locks were "buggered" (i.e., drilled out), which made him think it was stolen.  He called into the camper to see if anyone was inside and received no response, but he did not step into the camper.

{¶ 5} Wood County Sheriff's Deputy Jennifer Barocsi arrived at F.T.'s home around 1:00 p.m.  She wore a body-worn camera, and the recording from the encounter was admitted into evidence.  She took photographs, which were also admitted into evidence.

{¶ 6} Deputy Jennifer Barocsi read the note and asked F.T. who Hillbilly Bob is. F.T.  told her that he works at Elliot's junkyard in Rising Sun and "he's a fucking thief." Deputy Barocsi asked why Hillbilly Bob would park the camper there.  F.T. told her that "he used to park a lot of stolen cars" there before F.T. bought the property.  He described that his property used to be a chop shop and implied that Prichard was involved in it.  He said that he knows Hillbilly Bob to be "Bobby" (later identified as Robert Prichard).

2.

{¶ 7} F.T. told Deputy Barocsi that he called the phone number on the note and got Prichard's voicemail, which was full. Deputy Barocsi called in the license plate number and VIN and learned that the camper was licensed and registered to J.L. F.T. remarked, "Yeah, he's good at switching tags." The dispatcher said that J.L. lives in Butler County, Ohio—more than two hours south. F.T. commented, "they steal from all over the fucking place." F.T. told Deputy Barocsi that Hillbilly Bob did this same thing with a van two years ago and F.T. told him to take it away.

{¶ 8} The camper was a 2022 Keystone Cougar. It had not yet been reported stolen, but Deputy Barocsi told the dispatcher of her belief that it had been stolen. The dispatcher said she would reach out to J.L. Deputy Barocsi and F.T. continued to talk to each other. Much of their conversation revolved around how clear it was that the camper had been stolen. They repeatedly commented about how nice it was, but felt certain that it was stolen because the locks on the doors and compartments had been drilled out.

{¶ 9} While Deputy Barocsi was there, F.T. called the number on the note again. This time, Prichard answered and said he would be coming over. He said he had just needed somewhere to park the camper. In the meantime, Deputy Barocsi said that she was going to continue to figure out Hillbilly Bob's real name. F.T. responded, "everybody should know him. He's a fucking thief."

{¶ 10} Deputy Barocsi was eventually able to ascertain that "Hillbilly Bob" is Prichard—a name that was familiar to her. Additionally, the dispatcher spoke to J.L.'s wife who said that if the camper had a decal in the front window that said "Sookie Lue," then it was likely J.L.'s camper, but she wanted to speak with the storage facility to see if

3.

the camper was missing. Deputy Barocsi confirmed that the "Sookie Lue" decal appeared in the window.

{¶ 11} Prichard arrived in a pickup truck, which he backed directly up to the camper as if he intended to attach it to his truck. Upon exiting his vehicle, he went into the trailer and produced the registration, which, again, identified J.L. as the owner. Prichard said that he purchased the camper from "Adam" and that Adam brought the camper to its current location. Deputy Barocsi informed Prichard that the camper was stolen. Prichard told her he paid $4,500 for it. Deputy Barosci asked if he had a bill of sale. His response was unintelligible, but he did not produce a bill of sale at that time. Prichard acknowledged that he left the note and told F.T. that the camper belonged to him. While Prichard was standing next to her, Deputy Barocsi called the number on the note, and confirmed that it rang to Prichard's phone.

{¶ 12} Prichard then called a woman and spoke to her on speaker phone. After talking to her, he told Deputy Barocsi that he purchased the camper from "Adam and Dale Tilton" out of Dayton. At that point, Detective James Connin arrived and spoke with Prichard. Their conversation was also recorded and admitted as an exhibit at trial.

{¶ 13} Prichard told Det. Connin that Adam is in jail. He said that he got the travel trailer that morning at the Fuel Mart from Dale, who was driving a red Silverado. He confirmed that he did not tell F.T. that he planned to bring the camper to his property. Prichard told Det. Connin that he paid cash and claimed not to have inspected the camper. After learning that its current value is $36,525—information the dispatcher provided over radio communications—Prichard agreed that if he had inspected it, he would have been

4.

concerned that the value so far exceeded the price he paid for it. Deputy Barocsi arrested Prichard.

{¶ 14} Detective Connin testified that as part of his investigation, he went to Fuel Mart and reviewed surveillance footage from the day for the hours of 6:00 a.m. to noon. At 11:03 a.m.. he saw a red truck towing a camper, but it was much shorter than the 2022 Keystone Cougar camper. Det. Connin found no vehicle matching Prichard's description, however, he acknowledged that the area near the scales lacked camera coverage.

{¶ 15} From his investigation, Det. Connin learned from the Monroe Police Department in Liberty Township, Ohio, that the camper was taken from an outdoor storage facility. It was last seen at the storage facility on Sunday evening, October 20, 2024. Security cameras showed that it was removed by a truck similar to the vehicle Prichard described. Monroe PD could not locate or identify "Adam" in local or adjacent county jails and could not speak with "Dale Tilton."

{¶ 16} No mention of any bill of sale had been made by Prichard at the scene. However, in January of 2025, Det. Connin received a bill of sale from the prosecutor. It was admitted into evidence over Prichard's objection.

{¶ 17} The bill of sale was dated October 21, 2024. It listed "Adam Rays" as the seller, with an address of 5094 South Main Street, Dayton, OH 45377. The buyer was listed as "Robert Prichard," address [redacted] US Highway 23, Rising Sun 43457, with a phone number of 419-[redacted] (the same number left on the note from Hillbilly Bob). The bill of sale described the vehicle as a 2020 "Cougar Keystone," pull-behind, color

5.

"multi," with a 16-character VIN and an "actual" odometer reading of 5,000; price $4,500 cash inclusive of sales tax.

{¶ 18} Det. Connin verified that the recovered camper was a 2022, not 2020. The VIN on the bill of sale had 16 characters—standard VINs have 17 characters. The 16-character VIN did not fully match the recovered camper's VIN. Additionally, the recovered camper has no odometer. Det. Connin found that there is no such address as 5094 South Main Street, Dayton, OH 45377, and he was unable to locate or speak with any "Adam Rays" or "Dale Tilton," and Prichard could not provide contact information for these individuals.

{¶ 19} J.L. testified that he purchased the 2022 Keystone Cougar travel trailer new on May 19, 2022, for $63,000. He financed the purchase and his remaining balance at the time of trial was approximately $44,500. It was a luxury model and was in very good condition as of October 2024. Amenities included a king-size bed, mirrored closet, theater reclining seats with heat and massage, refrigerator, shower, heated tanks, porcelain toilet, electric fireplace, decorative storage, an outdoor grill, and solar panels. J.L and his wife added multiple smart TVs, kitchen appliances, dishes, linens, rugs, a canopy with screen, oscillating fans, and RV-specific equipment, including surge protector, water pressure regulator, and an anti-sway weight-distribution hitch.

{¶ 20} J.L stored the camper at a locked facility accessed by a gate code. He dropped it off the morning of Friday, October 18, 2024, and fully secured it by placing wheel chocks, locking all exterior "cubbies" and the main door, folding and securing the handrail, and disconnecting the battery switch. He observed no scratches, dings, dents, or

6.

tire issues when he dropped it off, and no one had permission to take or use the camper. No keys were missing. He surmised that the camper must have been taken Sunday night or Monday morning.

{¶ 21} When the camper was recovered, multiple exterior locks on the storage compartments and the main door were drilled or punched out and the hitch lock had been cut. The solar panel controller and inverter box were missing, rendering solar inoperable. The cost for replacement of those parts alone (not including labor) was listed at $5,046.16. Numerous items were missing, including TVs, bedding, sleeping bags, various cabinet contents, pressure regulator, gloves, and miscellaneous RV gear.

{¶ 22} The jury found Prichard guilty of receiving stolen property. The trial court sentenced him to an 18-month prison term. Prichard appealed. He assigns the following errors for our review:

> I. The trial court erred, or committed plain error, when it permitted testimony and the admission of a prejudicial exhibit that was improperly presented to the prosecution by defense counsel, and which was not authenticated[.]

> II. Trial counsel failed to protect Mr. Pritchard's (sic) rights and confidences and thereby provided constitutionally ineffective assistance[.]

## II. Law and Analysis

{¶ 23} Both of Prichard's assignments of error revolve around the bill of sale that was admitted into evidence during Det. Connin's testimony. When the State presented the bill of sale to Det. Connin, trial counsel objected on the basis that the State had not and could not authenticate the document. At a sidebar, trial counsel explained that she

7.

had provided the bill of sale to the State as part of her reciprocal duty of discovery. Her position was that only Prichard could authenticate the document. After considering the grounds for trial counsel's objection—and sua sponte raising and rejecting other possible bases for excluding it, such as hearsay and the right against self-incrimination—the trial court allowed the document to be used at trial and admitted into evidence.

{¶ 24} In his first assignment of error, Prichard argues that the trial court erred when it admitted the bill of sale into evidence. In his second assignment of error, Prichard argues that trial counsel was ineffective for producing it to the State in the first place and for failing to make proper objections to prevent its admission.

## A. Admission of the Bill of Sale

{¶ 25} In his first assignment of error, Prichard argues that the court erred in admitting the bill of sale because (1) it was prejudicial because it was insinuated to the jury that Prichard advanced this document and the inaccuracies in the document were attributed to Prichard; (2) there was no extrinsic evidence to authenticate the document; (3) the document is not what it purported to be; (4) there was no testimony about how and when Prichard acquired the document; (5) Prichard's signature was not authenticated; (6) there was no evidence about how the prosecutor got the document; and (7) when defense counsel told the court that her client gave her this document, she violated his Fifth Amendment rights and attorney-client privilege.

{¶ 26} The State responds that most of Prichard's objections on appeal were not raised in the trial court, so we must review those objections for plain error. It claims that admission of the bill of sale was not plain error or an abuse of discretion because (1)

8.

Prichard had a duty to disclose the bill of sale during discovery; (2) Prichard impliedly authenticated the document when he produced it in discovery; (3) if it wasn't authentic or relevant, it should not have been produced in the first place; and (4) the trial court did not abuse its discretion—it anguished and considered potential hearsay and Fifth Amendment objections sua sponte. The State maintains that even if the court erred in admitting the bill of sale, any error was harmless because the remaining trial evidence overwhelmingly demonstrated Prichard's guilt.

{¶ 27} Where error has been properly preserved, we review a challenge to the admission of evidence for an abuse of discretion. *State v. Conway*, 2006-Ohio-2815, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). Otherwise, we review under a plain-error standard. *State v. Jones,* 91 Ohio St.3d 335, 343 (2001).

### 1. The Record as it Relates to the Admission of the Bill of Sale

{¶ 28} The bill of sale was introduced during Detective Connin's direct examination as follows:

> Q: Okay. At some point in time did you receive a bill of sale?
>
> A: Yes. I received a copy of the bill of sale that was provided to you in January.
>
> Q: Okay. So I gave you the bill of sale?
>
> A: Yes.
>
> Q: And that would have been sometime in January?
>
> A: Yes.
>
> . . .

9.

Q: I'm handing you two exhibits, Exhibits 23-A, and 23-B. It is the bill of sale; is that correct?

A: Yes.

Q: Is that what I provided to you?

A: Yes, it is.

. . .

Q: And it clearly and accurately depicts what I provided to you?

A: Yes.

{¶ 29} The State moved for admission into evidence of the bill of sale, and defense counsel objected and requested a sidebar. She explained that the bill of sale was provided to her by her client and produced to the State pursuant to her reciprocal discovery obligation. She argued that "Mr. Prichard would be the individual that would be able to substantiate that it was what he provided to [counsel] then provided to [the State]." She maintained that the bill of sale "would be more appropriate as rebuttal evidence if Mr. Prichard were to take the stand."

{¶ 30} The court sought to clarify the basis for defense counsel's objection. It asked defense counsel: "Your objection is that this is a copy provided by you to the State as a part of your continuing duty as discovery and that the only way this comes in is that as somebody who actually completed this testifies to it, Adam Rays or Robert Pritchard (sic)?" Defense counsel confirmed that this was her position. The court allowed the State to continue questioning Det. Connin about the document, but reserved ruling on its admissibility.

10.

{¶ 31} As summarized above, the bill of sale purported to memorialize the sale of the camper. Once received from the State, Det. Connin investigated the information contained in the bill of sale. It was dated October 21, 2024—the day Prichard said he purchased the camper—and listed the seller as Adam Rays; Prichard, of course, had said he purchased the camper from "Adam." But Prichard had told police that "Adam" was in jail on October 21, 2024. Moreover, the bill of sale indicated that the camper was a 2020; it was a 2022. It provided an odometer reading of 5,000; the camper does not have an odometer. It provided a 16-digit VIN; VINs are 17 digits. The 16 digits did not correspond to the actual VIN. The seller's address did not exist.

{¶ 32} After Det. Connin testified, the trial court allowed jurors to ask questions, as it did with all witnesses. One juror asked: "Who provided the bill of sale to the prosecutor?" Another asked: "Where was the bill of sale obtained and from whom?" The State's attorney told the court that the detective "probably [didn't] know" where it came from. "He got it just from me. I forwarded it to him when I got it." The court declined to ask the jurors' questions.

{¶ 33} During this sidebar, the State again moved to admit the bill of sale, and defense counsel again objected. When asked the grounds, she said, "I don't think they can properly provide the basis for it. . . . And then they say we received it from the defense attorney. I mean how do they show where it came from and how it ends up where it is?"

11.

{¶ 34} The trial court focused on other possible bars to the admissibility of the document:

> Here is what my thing is. I'm trying to figure out what the evidentiary objection is. If it's hearsay, well, it's not being offered to prove the truth of the matter asserted in the document, it's being offered to prove that we investigated whether there was truth in the document. So from a hearsay statement I don't think it's hearsay. Is there a constitutional reason or is there a Fifth Amendment reason that they can't use it? That's what I'm trying to figure out. What is the evidentiary reason that it can't be admitted. It's relevant evidence. We've gone through that hurdle. Now, the next thing. It's not hearsay. But is the argument that the defense provided it so you can't use it?

{¶ 35} Defense counsel reiterated: "I don't think that there is a way for them to prove that it is what it is, would be the issue that I have, nor can anybody testify as to where it came from at this point in time." The court and the State took the position that the lack of testimony about where the bill of sale came from went to its weight and not to its admissibility. The State then changed course and while acknowledging that the document is "not necessarily self-authenticating under [Evid.R. 902]," argued that "it does authenticate, it does involve this particular camper on the date in question with the Defendant being the purchaser of it. We're saying he did that. So the information in the document itself basically establishes its authenticity."

{¶ 36} The trial court briefly acknowledged that defense counsel was objecting based on the failure to authenticate the bill of sale: "Her argument is . . . you've got a document, we don't know where the document came from." The State responded that "[i]t would be disingenuous to say wait a second, I provided to you that document but

12.

you can't establish what it is." Then the court returned to its earlier focus and decided to admit the document:

> I'm trying to figure out an evidentiary reason or a constitutional reason why it shouldn't be admitted. That's what I'm trying to figure out. So I'm going to admit it.

{¶ 37} During jury deliberations, the jury asked: "Can we know the chain of evidence for the bill of sale?" The trial court instructed the jury to "rely upon the evidence provided at the trial and your collective memory."

## 2. Authentication under Evid.R. 901

{¶ 38} "Before a document can be admitted into evidence, it must be properly authenticated as set forth in Evid.R. 901 or self-authenticating under Evid.R. 902." *State v. Fowler*, 2024-Ohio-361, ¶ 44 (2d Dist.). It is undisputed that the bill of sale was not self-authenticating.

{¶ 39} "A document is properly authenticated under Evid.R. 901 'by evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Id.* Authentication under Evid.R. 901 requires "extrinsic evidence of authentication or identification" before the item may be admitted as substantive evidence. *Id.,* quoting *Congress Park Business Ctr., L.L.C. v. Nitelites, Inc.*, 2007-Ohio-4200, ¶ 12 (2d Dist.).

{¶ 40} Evid.R. 901(B) identifies some methods of authentication, including testimony of a witness with knowledge that the evidence is what it is claimed to be; nonexpert opinion as to the genuineness of handwriting, "based upon familiarity not acquired for purposes of the litigation"; and distinctive characteristics, such as "[a]pearance, contents, substance, internal patterns, or other distinctive characteristics,

13.

taken in conjunction with circumstances." Evid.R. 901(B)(1), (2), and (4). "The most common method of authentication is through the testimony of a sworn witness with personal knowledge that the writing . . . is what it is claimed to be." *Banning v. Banning*, 2001 WL 127757, *1 (2d Dist. Feb. 16, 2001). "Absent such foundational evidence, the writing . . . lacks 'connective relevance' to the issue to be determined." *Id.,* quoting Weissenberger's Ohio Evidence, Section 901.1.

{¶ 41} This begs the question: what was the writing here claimed to be? The State certainly did not introduce the document claiming it to be a legitimate bill of sale. To the contrary, it introduced the document to show that it was a phony bill of sale produced by Prichard. *See State v. Cooper,* 120 Ohio App.3d 284, fn. 4 (10th Dist. 1997) ("The authentication inquiry is not whether the document is what its author claimed it to be but, rather, whether the document is what its proponent at trial claims it to be. Thus, a proffered document filled with lies and misrepresentations can be authenticated by testimony that the proffered document is indeed the document filled with lies and misrepresentations that its proponent claims."). Problematically, however, Det. Connin did not have personal knowledge of this fact. He could say only that it was provided to him by the State. Without foundational evidence establishing that the document was what the State claimed—a phony bill of sale produced by Prichard—the document lacked connective relevance to the case and should not have been admitted.

{¶ 42} The State argues that the bill of sale was impliedly authenticated by Prichard's production of the document in discovery. Some courts in civil cases—including the Ohio Supreme Court—have found "implied authentication" of documents

14.

produced by the opposing party during discovery. *Columbus City Schools Bd. of Education v. Franklin Cnty. Bd. of Revision,* 2020-Ohio-353, ¶ 22. In recognizing this potential method of authentication, the Court relied on the Second District's decision in *Stumpff v. Harris*, 2015-Ohio-1329 (2d Dist.).

{¶ 43} In *Stumpff*, the trial court excluded expert testimony that relied on documents—financial records and tax returns—that had been produced in discovery. The court found that the documents had not been properly authenticated. The Second District reversed. It concluded that the trial court erred in excluding the evidence "because these documents could be, and were, properly authenticated by testimony that they were documents that had been specifically requested from and provided by the opposing party . . . during discovery." *Id.* at ¶ 32.

{¶ 44} There were several reasons that the *Stumpff* court allowed for implied authentication. First, the documents were produced in response to a specific discovery request. Second, the documents were the subject of a discovery dispute and an eventual motion for sanctions, and the expert testified that he was at the hearing where the documents were ultimately produced. Third, there was nothing about the documents, on their face, to suggest that they were not authentic.

{¶ 45} The Second District cautioned that its holding should not be viewed as providing that "everything produced in discovery should automatically be deemed authenticated." *Id.* ¶ at 38. For instance, it cited *Cramer v. NEC Corp. of America,* 2012 WL 5489395, *2 (5th Cir. Nov. 13, 2012), where the court held that a document purporting to be a job description was not authenticated by production in discovery

15.

because "the discovery request was too broad to provide evidence of authenticity, the document itself bore no indication of authenticity, and deposition testimony regarding the document was noncommittal." It also cited an Ohio Supreme Court case where the Court found that the mere fact that a videotape had been produced by the State did not excuse the defendant from authenticating it, but suggested that the defendant "'could have properly authenticated the [video] with evidence that it was the tape he had received in discovery.'" *Stumpff* at ¶ 37, citing *State v. Sanders,* 92 Ohio St.3d 245, 258 (2001).

{¶ 46} Ultimately, the Second District advised that in deciding whether to permit "implied authentication," trial courts should consider "the totality of the circumstances surrounding the documents' production, including, but not limited to, the specificity of the discovery request, the nature of the documents, and the party responding to the discovery request." *Id.* at ¶ 39.

{¶ 47} In *Columbus City Schools*, the Court noted that the producing party's counsel indicated at the administrative hearing that the documents at issue had been produced by his client in discovery. The Court found that implied authentication was appropriate, particularly because the documents had been produced "in response to a specifically tailored discovery request." *Id.* at ¶ 22.

{¶ 48} Importantly, however, *Columbus City Schools* established a caveat that raises doubt as to its applicability here. That case involved an administrative appeal from a Board of Taxation decision. The Court began its discussion of the authentication issue by observing that (1) it generally defers to the BTA's determination of the competency of evidence presented to it; (2) because the BTA is an administrative agency and not a court,

16.

it is not bound by the Rules of Evidence; and (3) although the producing party objected to the admission of the evidence, it did not question "the substance" of the documents. *Id.* at ¶ 19. "Accordingly," the Court explained, its "conclusions [] pertain to administrative proceedings and are not necessarily definitive of how the Rules of Evidence might apply in a court." *Id.*

Here, unlike *Columbus City Schools*, this was a jury trial in common pleas court—not an administrative hearing. The Rules of Evidence apply. Moreover, unlike *Stumpff*, this is a criminal case—not a civil case. Although Crim.R. 57(B) permits guidance from the civil rules or civil case law where no criminal rule applies, a criminal defendant's constitutional rights may limit the applicability of civil rules to a criminal case. *State v. Spikes,* 67 Ohio St.2d 405, 408 (1981). Additionally, unlike *Stumpff* and *Columbus City Schools*, there is nothing to suggest that there was a specifically-tailored request for the bill of sale. It was produced generally under Crim.R. 16(H) (creating reciprocal duty of discovery where defendant demands discovery from State). Finally, unlike the expert witness in *Stumpff* who was present at the hearing where the relevant documents were produced, Det. Connin was able to say only that he received the document from the State—he could not identify the document as having been produced by Prichard himself because he lacked personal knowledge of this fact. And as suggested by *Sanders*, cited in *Stumpff*, some foundation was still required establishing that the evidence was produced during discovery. *See Sanders* at 258 ("Sanders did not show that the tape he wanted to

17.

play was either the original tape or the same copy of that tape that the state had given him in discovery.").[1]

{¶ 49} Authentication or identification was a condition precedent to the admissibility of the bill of sale, and the relevance of this document depended on it having come from Prichard. A witness with personal knowledge needed to testify that this was a true and accurate copy of a document produced by Prichard in discovery.[2] Det. Connin simply lacked any personal knowledge of the origin of this document. Implied authentication is not appropriate here because this was a criminal jury trial to which the Rules of Evidence apply. The trial court erred when it admitted this document without proper authentication.

### 3. Harmless Error

{¶ 50} Having determined that the trial court erred in admitting the bill of sale, we must determine whether this error requires reversal or whether it was harmless error. The State argues that even if the trial court erred in admitting the bill of sale into evidence, this error was harmless because even excising the bill of sale, the remaining evidence of Prichard's guilt was substantial. Specifically, it emphasizes that Prichard claimed

---

[1] In *Sanders*, the defendant wanted to show that the recording had been altered by the State. The Court found that because he had not established that the recording had been produced by the State, "he laid no foundation from which the jury could find that the state was responsible for any alleged alterations of the recording." *Id.*

[2] We recognize that the State could have sought a stipulation from defense counsel that this was a true and accurate copy of a document produced by the defense in discovery. Such a stipulation may have impliedly authenticated the document for the jury at trial. The State, however, did not do this.

18.

ownership of a $63,000 travel trailer the day after it was stolen from southern Ohio; he purchased it for $4,500, significantly below its obvious value; the locks had been drilled; expensive amenities were missing; the registration was in the victim's name; Prichard was inconsistent about the seller's identity; and his story about picking up the camper from the Fuel Mart was refuted by video surveillance. The State insists that the bill of sale "was perhaps the least important single piece of evidence."

{¶ 51} Prichard emphasizes that the prosecutor relied on the bill of sale in closing, and the jury specifically questioned the chain of custody of the bill of sale, suggesting its significance to the verdict. Specifically, after Det. Connin's testimony, two jurors proposed questions about the origin of the bill of sale: "Who provided the bill of sale to the prosecutor?" and "Where was the bill of sale obtained and from whom?" Then during deliberations, the jury asked again: "Can we know the chain of evidence for the bill of sale?"

{¶ 52} The harmless error doctrine is governed by Crim.R. 52(A), which provides that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." An error affects "substantial rights" if it was prejudicial. *State v. Fisher*, 2003-Ohio-2761, ¶ 7, quoting *United States v. Olano*, 507 U.S. 725, 734 (1993). If an error does not affect a defendant's substantial rights, it is harmless and "shall be disregarded." Crim.R. 52(A). The State has the burden of proving that an error did not affect the defendant's substantial rights. *State v. Perry*, 2004-Ohio-297, ¶ 15.

{¶ 53} The Ohio Supreme Court utilizes a three-part analysis to determine whether the erroneous admission of evidence affected the defendant's substantial rights, requiring

19.

a new trial, or whether the admission of that evidence was harmless error under Crim.R. 52(A): (1) whether the defendant was prejudiced by the error, i.e., whether it had an impact on the verdict; (2) whether the error was not harmless beyond a reasonable doubt; and (3) whether, once the prejudicial evidence is excised, the remaining evidence establishes the defendant's guilt beyond a reasonable doubt. *State v. Harris,* 2015-Ohio-166, ¶ 37, citing *State v. Morris,* 2014-Ohio-5052, ¶ 22–29.

{¶ 54} Prichard admitted that he purchased the trailer from "Adam" for $4,500 cash. The evidence showed that this was a luxury camper with numerous upgrades and was worth substantially more than what Prichard paid for it. It was clear to every person who saw it—F.T., Deputy Barocsi, Det. Connin—that this camper had been tampered with. The locks on the door and the compartments had been drilled out and the inside had been gone through. Even the most cursory inspection of its exterior would have given Prichard reasonable cause to believe that it had been stolen. In addition to this, Prichard provided inconsistent information about who he purchased the camper from (Adam or Dale) and where the transfer of the property occurred (fuel Mart or Railroad Avenue). And according to F.T., Prichard had left stolen vehicles on this property before.

{¶ 55} Under the facts of this case, we conclude that excising the erroneously-admitted bill of sale, the remaining evidence established Prichard's guilt beyond a reasonable doubt. Although the jury was interested in the source of the bill of sale, the remaining evidence against Prichard was so strong that we cannot conclude that the admission of the bill of sale impacted the verdict.

{¶ 56} We find Prichard's first assignment of error not well-taken.

20.

## B. Ineffective Assistance of Counsel

{¶ 57} In his second assignment of error, Prichard argues that trial counsel was ineffective for (1) producing the bill of sale to the State in the first place, and (2) failing to make proper objections to prevent its admission into evidence.

{¶ 58} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287 (7th Dist. 1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151 (2002).

{¶ 59} Having determined that the erroneous admission of the bill of sale constituted harmless error, it follows that Prichard cannot show that there was a reasonable probability of a different outcome had defense counsel raised additional objections to its admission or had not produced the document in the first place. *See State v. Kinney*, 2025-Ohio-1620, ¶ 92 (6th Dist.) ("[W]e have already determined that the admission of those statements was harmless error, thus there was not a reasonable probability that the outcome of the proceedings would have been different had trial

21.

counsel objected to those statements."); *State v. Adams,* 106 Ohio App.3d 139, 145 (10th Dist. 1995) ("Having determined that the erroneous admission of State's exhibit No. 4 did not prejudice defendant, the failure to object to the admission of this evidence did not constitute ineffective assistance of counsel."). And "[b]ecause a defendant must prove both prongs under *Strickland,* a reviewing court need not address the deficiency prong if the defendant was not prejudiced by counsel's performance." *State v. Maher*, 2017-Ohio-7807, ¶ 40 (12th Dist.), citing *State v. Boeddeker*, 2010-Ohio-106, ¶ 11 (12th Dist.).

{¶ 60} We find Prichard's second assignment of error not well-taken.

### III. Conclusion

{¶ 61} The trial court erred when it admitted into evidence a document—a phony bill of sale—produced by Prichard that had not been properly authenticated. The significance of this piece of evidence was that it had been produced by Prichard, yet the State failed to present testimony of a sworn witness who had personal knowledge that Prichard produced the document. Implied authentication was not appropriate here because this was a jury trial in common pleas court to which the Rules of Evidence apply, it was a criminal case, there is no indication that the document was produced in response to a specifically-tailored request, and the testifying witness lacked personal knowledge of the source of the document. However, excising the erroneously-admitted bill of sale, the remaining evidence established Prichard's guilt beyond a reasonable doubt and evidence of his guilt was so strong that the admission of the bill of sale did not impact the verdict. The error in admitting this evidence was harmless. We find Prichard's first assignment of error not well-taken.

22.

{¶ 62} Given our conclusion that the error here was harmless, Prichard cannot succeed on his claim that counsel was ineffective for producing the bill of sale or failing to raise proper objections to its admission because he cannot show that there is a reasonable probability of a different outcome but for counsel's errors. We find Prichard's second assignment of error not well-taken.

{¶ 63} We affirm the April 21, 2025 judgment of the Wood County Court of Common Pleas. Prichard is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, P.J.

Christine E. Mayle, J.

Charles E. Sulek, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.